# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Tommy Laquade Stewart, | Case No. 2:21-cv-01490-APG-BNW |
| Petitioner | **Order Denying Petition for Writ of Habeas Corpus and Denying a Certificate of Appealability** |
| v. | |
| Ronald Oliver,[1] *et al.*, | [ECF No. 15] |
| Respondents | |

In 2016, a Nevada jury convicted petitioner Tommy Laquade Stewart of conspiracy to commit robbery, robbery, burglary, and first-degree kidnapping. ECF No. 25-12.  The state district court imposed a sentence of imprisonment for an aggregate of eight years to life. *Id.* Stewart filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 15.  He claims (1) insufficient evidence supports the first-degree-kidnapping conviction; (2) trial counsel was ineffective in failing to timely move to suppress Stewart's statements to police and the trial court erroneously admitted the statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); (3) trial and appellate counsel were ineffective in failing to pursue instructions on lesser-included offenses; (4) trial counsel was ineffective in failing to move to exclude the pretrial identification, object to the admission of jail calls, and object to testimony about the co-perpetrator's actions; and (5) cumulative error. *Id.*  I deny the petition and deny a certificate of appealability.

---

[1] The state corrections department's inmate locator page stated that Stewart is incarcerated at the Southern Desert Correctional Center where Ronald Oliver is the warden.  Southern Desert Correctional Center Facility | Nevada Department of Corrections (nv.gov).  I direct the clerk of the court to substitute Rondald Oliver for respondent Calvin Johnson under Rule 25(d) of the Federal Rules of Civil Procedure.

# I.      Background Summary[2]

At around 11:00 p.m. on January 20, 2015, Natasha Lumba arrived at the gate leading to the patio outside the front door to her apartment in Las Vegas, Nevada.  She noticed two African-American men, wearing dark hoodies (with the hoods up) and dark pants, approach her "rather quickly."  The men came "right next" to her while she was "fumbling" for her keys at her front door.  She started to panic, and she believed the taller man held up a firearm while the shorter man instructed her not to yell or they would harm her.  The men instructed her to open her front door and followed her into her apartment.  It was dark, but she saw their faces, and had never seen either of them before that night. ECF No. 24-1 at 11–36.

Inside Lumba's apartment, she dropped her purse and bag, and complied with their demand that she lay face down on the floor in her back bedroom.  As she lay there, the men took turns looking after her and searching her apartment.  They asked her if she was a prostitute, and she told them "no."  The shorter man asked where she hid her cash, "what could be sold for money," and searched under her brassiere and underwear for cash.  She told them she only had $2.00 in her wallet.  They asked for the PINs to access her debit card and iPhone.  She gave them the PINs because she was "terrified" for her life.  She did not feel free to leave because as far as she knew there was a gun and there were two men.  Before the men left, one of them told her not to call the police or they would return to kill her. *Id.* at 11–36, 58.

After the men left, Lumba discovered they stole her iPhone, laptop computer, camera, and $2.00 from her wallet.  However, she found her iPad and used it to change her password for her iPhone using iCloud, and then went to her boyfriend's house.  She and her boyfriend called

---

[2] The background summary is based on the state court record, serves only as background to the issues presented in this case, and does not summarize all such material.  My failure to mention evidence does not mean I overlooked it.

911 while on their way to her parents' house.  That night, the Las Vegas Metropolitan Police Department (Metro) lifted a fingerprint from a box of sewing notions that the perpetrators moved in the laundry area of Lumba's apartment. ECF Nos. 24-1 at 25–28, 32–35; 24-2 at 3–20.

On January 28, 2015, Metro forensic scientist and certified latent fingerprint examiner Heather Gouldthorpe examined the fingerprint taken from the sewing box.  Using the Automated Fingerprint Identification System (AFIS), Gouldthorpe received notice of a potential fingerprint match with Stewart.  She compared Stewart's archived fingerprint exemplars, and concluded the print taken from the sewing box was a match.  Gouldthorpe said her report was completed that day and then sent to another forensic scientist for technical review.  In closing remarks to the jury, defense counsel argued that, according to Gouldthorpe's report and testimony, she printed Stewart's fingerprints much later—in April of 2015. ECF Nos. 24-2 at 21–43; 24-3 at 19–20.

Metro Detective Jeffrey Abell testified he received Gouldthorpe's report on January 28, 2015, constructed a photographic lineup array (lineup) with Stewart's picture in position #3, and showed it to Lumba on February 6, 2015.  Before showing Lumba the lineup, she signed the lineup instructions.  Lumba did not make a positive identification, but chose two photographs, including Stewart's because he looked "a lot like the taller robber," and stated:

> After viewing the photos shown to me by detective Abell, the people in the photos #2 & #3 have similar features to the people who robbed me.  #2 has a similar nose, face shape to the shorter assailant, but different eyes and mouth.  #3 has a similar face shape, eyes, nose, complexion & face shape as the taller assailant. However, both the assailants are thinner than #2 or #3. #3 looks a lot like the taller robber that I remember.

ECF No. 24-2 at 76–85.

A week later, Metro was on the lookout for Stewart as a suspect in Lumba's case and saw Stewart place a firearm inside a vehicle.  Metro arrested Stewart and seized more than one

firearm from the vehicle.  Detective Abell booked Stewart into custody, noting Stewart is 5'5" tall.  Before interviewing Stewart at police headquarters, Abell read *Miranda* rights from a Metro card and Stewart confirmed he understood his rights.  Stewart denied he was ever at Lumba's apartment complex or knew anyone living there.  When Abell confronted Stewart with the fingerprint found at Lumba's apartment, Stewart initially told Abell that was "impossible." However, Stewart eventually stated he and a friend met a girl (who they thought was a prostitute) at the overpass bridge near the MGM and followed her to her residence.  Stewart claimed his friend had sex with the girl in her bedroom while Stewart looked for items to steal.  Abell showed Stewart a photograph of Lumba's sewing box and Stewart admitted he saw sewing supplies inside it when he was inside Lumba's apartment; but, according to Abell, Stewart never admitted he was "part of any robbery."  *Id.* at 44–75, 91–97, 106.

At trial, Lumba did not positively identify Stewart as one of the perpetrators.  She said she did not know Stewart and never invited him into her home.  She described one of the perpetrators as about 5'10" and the other as two inches shorter. She admitted that she testified at the preliminary hearing that the taller man was 5'11" to 6' and the shorter man was 5'9" to 5'11".  She said the taller man pointed a black semiautomatic gun at her while they were outside her apartment, but she did not ever see the gun again.  She told the 911 operator one of the men told her he had a gun, she believed he had a gun, and she saw an object that resembled a gun, but agreed she did not see clearly as it was dark.  ECF No. 24-1 at 15–16, 42–47, 53–58.

## II.     Governing Standards of Review

### A.     Antiterrorism and Effective Death Penalty Act

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may grant habeas relief with respect to that claim only if the state court's adjudication "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).  A state court's decision is contrary to clearly established Supreme Court precedent within the meaning of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court's decision is an unreasonable application of clearly established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . . [Rather,] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.*

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the

benefit of the doubt.") (internal citations omitted).  A state court is not required to cite Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  The petitioner carries the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

### B.      Effective Assistance of Counsel

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).  A petitioner claiming ineffective assistance of counsel (IAC) must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  The errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

For *Strickland's* performance prong, a petitioner making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690  It is inappropriate to focus on what could have been done rather than focusing on the reasonableness of counsel's performance. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687–94).  Thus, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Strickland,* 466 U.S. at 689–90.  In considering such claims, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id; see also Harrington*, 562 U.S. at 104–05.  The Supreme Court describes federal review of a state court's decision on an IAC claim as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  So, I take a "'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citation omitted).

To prevail on an ineffective assistance of appellate counsel claim, a petitioner must show (1) appellate counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and (2) "a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith*, 528 U.S. at 285–86.  "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).  The *Strickland* prongs "partially overlap" when applied to a claim of ineffective assistance of appellate counsel:

> In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (internal citations and footnotes omitted).

///

///

7

**C.      Procedural Default**

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022).  Where a petitioner fails to do so and therefore "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioners may overcome cause for procedural default of a claim of ineffective assistance of trial counsel where (1) the claim of ineffective assistance of trial counsel is a "substantial" claim; (2) the "cause" consists of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim[;]" and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."[3] *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012) and relying on *Coleman*, 501 U.S. 722).  An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

///

///

---

[3] Nevada requires prisoners to first raise claims of ineffective assistance of trial counsel in a state post-conviction review petition, which is the initial collateral review proceeding for purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

**III.      Discussion**

**A.      Ground 1—Sufficiency of the Evidence for First-Degree Kidnapping**

Stewart alleges there is insufficient evidence to support his conviction for first-degree kidnapping, in violation of due process under the Fifth and Fourteenth Amendments.  He claims the movement of Lumba to her bedroom was incidental to the robbery and failed to support dual convictions for robbery and first-degree kidnapping under Nevada law.  He contends this court owes no deference to the Supreme Court of Nevada's determinations under 28 U.S.C. § 2254(d) because those determinations are contrary to and unreasonably applied Supreme Court authority and are based on an unreasonable determination of the facts. ECF Nos. 15 at 5–10; 50 at 17–25.  The respondents contend the Supreme Court of Nevada's determination that sufficient evidence supports the conviction is objectively reasonable. ECF Nos. 47 at 8–12; 55 at 4–6.  For the reasons discussed below, the Supreme Court of Nevada's rejection of this claim is objectively reasonable and Stewart is not entitled to federal habeas relief for Ground 1.

**1.      Applicable Legal Principles**

A jury's verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 324 (1979) (emphasis in original).  The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  A reviewing court, "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

///

1    Circumstantial evidence is "intrinsically no different from testimonial evidence" because,

2  although "circumstantial evidence may in some cases point to a wholly incorrect result," this is

3  "equally true of testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954)

4  (rejecting contention that circumstantial evidence must exclude every hypothesis but that of

5  guilt).  "In both instances, a jury is asked to weigh the chances that the evidence correctly points

6  to guilt against the possibility of inaccuracy or ambiguous inference," and "[t]he jury must use its

7  experience with people and events in weighing the probabilities." *Id.*  "If the jury is convinced

8  beyond a reasonable doubt, [the Supreme Court requires] no more." *Id. see also Jackson*, 443

9  U.S. at 324–26 (finding circumstantial evidence sufficient to prove specific intent to kill).

10    In Nevada, first-degree kidnapping is defined in relevant part as follows:

11        A person who willfully seizes, confines, inveigles, entices, decoys,
         abducts, conceals, kidnaps or carries away a person by any means
12        whatsoever with the intent to hold or detain, or who holds or
         detains, the person for ransom, or reward, or for the purpose of
13        committing sexual assault, extortion or robbery upon or from the
         person . . . is guilty of kidnapping in the first degree . . . .

14

15  Nev. Rev. Stat. § 200.310(1).  The Supreme Court of Nevada has held that "[t]o sustain

16  convictions for both robbery and kidnapping arising from the same course of conduct, any

17  movement or restraint must (1) "stand alone with independent significance from the act of

18  robbery itself," (2) "create a risk of danger to the victim substantially exceeding that necessarily

19  present in the crime of robbery," or (3) "involve movement, seizure or restraint substantially in

20  excess of that necessary to its completion." *Mendoza v. State*, 122 Nev. 267, 270, 275 (2006).

21        **2.    Additional Background**

22    In closing remarks, defense counsel argued the kidnapping was incidental to the robbery

23  because Stewart was "there simply to rob her" and "they put her in her house, they sent her to her

1 room, and that was it.  It was all in the grand scheme of committing the robbery."  In rebuttal, the

2 State argued moving Lumba was not incidental to the robbery based on "the moving of [Lumba]

3 from that front porch . . . moving her from the gate from outside of her front door to the back

4 bedroom."  The State argued Stewart could have robbed Lumba outside her front door but moved

5 her to the farthest point inside her apartment so he could burglarize the apartment.  The State

6 argued "having these two men she did not know in the apartment and then placing her in a place

7 where she had the least likely chance of running out, calling for help, increased, substantially

8 increased, the risk of harm to her." ECF No. 24-3 at 21–22, 32–34.

9 **3. Supreme Court of Nevada's Determination**

10 On direct appeal, the Supreme Court of Nevada determined the State presented sufficient

11 evidence to support dual convictions for robbery and first-degree kidnapping:

> 12 The crime of first-degree kidnapping is described in NRS
> 200.310(1), while the crime of robbery is defined in NRS 200.380.
> 13 A conviction for first-degree kidnapping requires that a "person . . .
> willfully seizes, confines, . . . conceals, kidnaps or carries away a
> 14 person by any means whatsoever . . . for the purpose of committing
> . . . robbery upon or from the person." NRS 200.310(1).  A
> 15 conviction for robbery requires "the unlawful taking of personal
> property from the person of another . . . against his or her will, by
> 16 means of force or violence or fear of injury, immediate or future, to
> his or her person or property." NRS 200.380.  Dual convictions
> 17 under both statutes are permitted based upon the same conduct.
> *Mendoza v. State,* 122 Nev. 267, 274–75, 130 P.3d 176, 180
> 18 (2006).  However, in such cases:

> 19 [T]o sustain convictions for both robbery and
> kidnapping arising from the same course of
> 20 conduct, any movement or restraint must stand
> alone with independent significance from the act of
> 21 robbery itself, create a risk of danger to the victim
> substantially exceeding that necessarily present in
> 22 the crime of robbery, or involve movement, seizure
> or restraint substantially in excess of that necessary
> 23 to its completion.

*Id.* at 275, 130 P.3d at 181.  In general, "[w]hether the movement of the victim is incidental to the associated offense and whether the risk of harm is substantially increased thereby are questions of fact to be determined by the trier of fact in all but the clearest cases." *Curtis D. v. State,* 98 Nev. 272, 274, 646 P.2d 547, 548 (1982); *see also Gonzales v. State,* 131 Nev., Adv. Op. 49, 354 P.3d 654, 666 (Ct. App. 2015).

Here, we conclude that there is sufficient evidence to support Stewart's dual convictions for robbery and first-degree kidnapping. The jury heard evidence that Stewart took Lumba's personal property against her will by means of force, violence, or fear of injury.  Further, the jury heard evidence that Lumba's movement substantially exceeded the movement necessary to complete the robbery and/or substantially increased the harm to her.  Indeed, Lumba was accosted as she entered her residence, taken to the back bedroom, guarded at gunpoint, face down, while Stewart and the other suspect rummaged through her house and stole her belongings.  Whether Lumba's movement was incidental to the robbery, and whether the risk of harm to her was substantially increased, are questions of fact to be determined by the jury in "all but the clearest of cases." *Curtis D.,* 98 Nev. at 274, 646 P.2d at 548.  This is not one of the "clearest of cases" in which the jury's verdict must be deemed unreasonable; indeed, a reasonable jury could conclude that Stewart forcing Lumba from her front door into her back bedroom substantially exceeded the movement necessary to complete the robbery and that guarding Lumba at gunpoint substantially increased the harm to her.  We conclude that the evidence presented to the jury was sufficient to convict Stewart of both robbery and first-degree kidnapping.

ECF No. 25-25 at 5–7.

### 4.      Analysis of Ground 1

Stewart claims that I need not conduct deferential review under AEDPA.  He claims the Supreme Court of Nevada's determination is contrary to, and unreasonably applied, *Jackson* because it determined "[w]hether Lumba's movement was incidental to the robbery, and whether the risk of harm to her was substantially increased, are questions of fact to be determined by the jury in all *but the clearest of cases,*" and this is not one of those clear cases. ECF No. 50 at 22–23

1  (emphasis added).  The Supreme Court of Nevada correctly identified and reasonably applied the

2  *Jackson* standard. *Early*, 537 U.S. at 8.  The court recited *Jackson*'s standard and cited decisions

3  that applied *Jackson*. *See Mitchell*, 124 Nev. at 816 n.14, 192 P.3d at 727 n.14.  The court

4  reasonably invoked the *Jackson* standard by determining this is not one of the clearest of cases in

5  which the jury's verdict must be deemed unreasonable because a reasonable jury could conclude,

6  consistent with the third option for dual convictions of robbery and kidnapping, that Stewart

7  forcing Lumba from outside her front door into the back bedroom inside her apartment

8  substantially exceeded the movement necessary to complete the robbery.

9       Stewart claims I need not conduct deferential review under AEDPA because the Supreme

10  Court of Nevada unreasonably determined Stewart guarded Lumba "at gunpoint," which is

11  contrary to the jury's acquittal on the enhancements for using a firearm. ECF Nos. 25-3 at 2–3;

12  50 at 24.  Stewart may be correct, however, the Supreme Court of Nevada reasonably determined

13  sufficient evidence supports dual convictions for robbery and kidnapping because Stewart forced

14  Lumba inside the apartment and to her back bedroom, which constituted movement substantially

15  in excess of the movement or restraint necessary to accomplish robbery.  That determination is

16  objectively reasonable because the trial evidence established the robbery could have been

17  accomplished by detaining Lumba outside her door while the apartment was burglarized. *See*

18  *e.g., Gonzales v. State*, 131 Nev. 481, 497–500, 354 P.3d 664, 666 (2015) (evidence sufficient

19  for robbery and kidnapping where accomplices forced victim at gunpoint from her open garage

20  into the house and moved her from room to room, as they could have accomplished the robbery

21  by detaining her in the garage while they searched the house).

22       Stewart relies on *Wright v. State*, 94 Nev. 415, 581 P.2d 442 (1978) to argue the Supreme

23  Court of Nevada's determination is objectively unreasonable. ECF No. 15 at 15–16.  The

Supreme Court of Nevada held in *Wright* that moving a victim from one room inside a house to another room in search of valuables during the commission of a robbery is insufficient, by itself, to sustain convictions for both kidnapping and robbery. *Wright,* 94 Nev. at 417–18, 581 P.2d at 443–44 (reversing kidnapping conviction as incidental to robbery when movement from room to room occurred to locate valuables and "only for the short period of time necessary to consummate the robbery.")  Unlike in *Wright*, Lumba was first moved from outside her apartment to the back bedroom inside her apartment.  A reasonable jury could conclude that moving Lumba from the public area of her front door to the privacy of her bedroom inside her apartment was unnecessary to completion of the robbery, extended the time over which the robbery took place, and substantially exceeded that necessary to accomplish the robbery for purposes of dual convictions for robbery and first-degree kidnapping.  I deny relief on Ground 1.

**B.**    **Ground 2—Admission of Stewart's Statements to Police**

Stewart alleges the state district court improperly admitted his statements to police because he received an inadequate *Miranda* warning in violation of the Fifth and Fourteenth Amendments.  Stewart claims he was insufficiently advised he had a right to counsel before, during, and after questioning, and the right to consult an attorney throughout interrogation. ECF Nos. 15 at 10–14; 50 at 26–31.  The respondents contend the Supreme Court of Nevada's application of *Miranda* in denying the claim was objectively reasonable. ECF Nos. 47 at 13–15; 55 at 6–8.  For the reasons discussed below, I deny habeas relief for Ground 2 as the Supreme Court of Nevada reasonably determined the warnings to Stewart were sufficient under *Miranda.*

**1.**    **Applicable Legal Standards for *Miranda* Warnings**

The prosecution "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural

safeguards effective to secure the privilege against self-incrimination." *Miranda,* 384 U.S. at 444. "At the outset, if a person in custody is to be subjected to interrogation," he must be warned "in clear and unequivocal terms" that (1) he has a right to remain silent; (2) any statement he does make may be used as evidence against him in a court of law; and (3) he has the right to the presence of an attorney, either retained or appointed. *Id.* at 444–45, 467–79.

The "[n]eed for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." *Id.* at 470. Thus, "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation," "this warning is an absolute prerequisite to interrogation," and "[n]o amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead." *Id.* at 471–72.

"The warnings required and the waiver necessary in accordance with [*Miranda*] are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant." *Id.* at 476 (emphasis added); *see Fla. v. Powell*, 559 U.S. 50, 60 (2010) ("The four warnings *Miranda* requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed."); *Duckworth v. Eagan*, 492 U.S. 195, 202–04 (1989) (stating courts "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement," rather, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*'" and determining *Miranda* does not require attorneys be producible on call; only that the suspect be informed of his right to an attorney before and during questioning, and an attorney will be appointed if he cannot afford one); *California v. Prysock*, 453 U.S. 355, 356–60 (1981) (noting "no talismanic incantation was

required to satisfy" *Miranda* and it sufficed to warn a suspect of, among other things, the right to a lawyer's presence during questioning and to counsel at no cost).

In *Powell*, the Supreme Court considered the sufficiency of warnings that a suspect had "the right to talk to a lawyer before answering any of our questions" and "the right to use any of these rights at any time you want during this interview," but not expressly advising the right to an attorney's presence during questioning. 559 U.S. at 54, 60–62. The Court concluded the warnings satisfied *Miranda's* dictate "that an individual held for questioning 'must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation,'" because they "reasonably conveyed [the defendant's] right to have an attorney present, not only at the outset of interrogation, but at all times." *Id.* (quoting *Miranda*, 384 U.S. at 471). The Court reasoned that to reach the conclusion that the attorney would not be present throughout the interrogation, a suspect would have to imagine an unlikely scenario: To consult counsel, he would "exit and reenter the interrogation room between each query." *Id.*

### 2.   Additional Background

Before giving statements to the police, Stewart confirmed he understood the following warnings: "[Y]ou have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney during questioning. If you cannot afford an attorney, one will be appointed before questioning. Do you understand these rights?" ECF No. 23-11 at 4. Stewart moved to suppress his statements claiming he was not warned of his right to consult an attorney before questioning. *Id.* at 6. The state district court denied the motion as untimely and on the merits finding the warnings adequately advised him of his *Miranda* rights. ECF No. 23-13 at 4. Stewart's incriminating statements were admitted via the testimony of Detective Abell. *See supra* at p. 4.

### 3.      Supreme Court of Nevada's Determination

The Supreme Court of Nevada determined the *Miranda* warnings were adequate to advise

Stewart of his right to consult an attorney before and during interrogation:

> Stewart first argues the *Miranda* warning given in this case did not
> inform him that he could consult an attorney before and during
> questioning.  This argument is not supported by the record. The
> *Miranda* warning given to Stewart stated, in part, "You have the
> right to have the presence of an attorney during questioning.  If
> you cannot afford an attorney one will be appointed before
> questioning."  Given a commonsense reading, these two clauses
> provide a constitutionally adequate warning—the warning
> informed Stewart he had the right to counsel before and during
> questioning, as specifically required by *Miranda. See Powell,* 559
> U.S. at 63.  Although the warnings were perhaps not the clearest
> possible formulation of *Miranda's* right-to-counsel advisement,
> they were constitutionally sufficient. *Id.*  Thus, we conclude
> Stewart's first *Miranda* argument fails.
>
> Additionally, Stewart argues that the warning only advised him
> that he had the right to an attorney but not that he could actively
> consult with that attorney throughout the questioning.  We
> conclude this argument is without merit.  Indeed, the right to an
> attorney *is* the right to consult with that attorney; and the argument
> to the contrary relies on an absurd interpretation of the *Miranda*
> warning. *See Powell,* 559 U.S. at 62–63.  Thus, we conclude
> Stewart's second *Miranda* argument fails.
>
> Therefore, we hold that the district court did not err in determining
> Stewart received an adequate *Miranda* warning prior to making
> statements to police and, thus, did not err in denying Stewart's
> motions to suppress those statements.

ECF No. 25-25 at 7–9.

### 4.      Analysis of Ground 2

The Supreme Court of Nevada reasonably determined the warnings given to Stewart were

sufficient under *Miranda* because they informed him that he had the right to the presence of an

attorney before and during questioning, and the presence of an attorney necessarily includes the

1    right to consult the attorney before and during questioning. *Powell*, 559 U.S. at 60 (quoting

2    *Miranda*, 384 U.S. at 471).  To conclude the warnings do not convey Stewart's right to consult

3    an attorney requires "imagin[ing] an unlikely scenario." *Id.* at 62.  I therefore deny Ground 2.

4        **C.**     **Ground 3—IAC—Lesser-Included Offenses**

5        Ground 3(A) alleges trial counsel was ineffective in failing to request an instruction for

6    false imprisonment.  Ground 3(C) alleges trial counsel was ineffective in failing to request an

7    instruction for second-degree kidnapping. Ground 3(D) alleges appellate counsel was ineffective

8    in failing to challenge the trial court's failure to instruct on second-degree kidnapping.  Stewart

9    contends he was entitled to the instructions because one cannot commit first-degree kidnapping

10   without also committing second-degree kidnapping and false imprisonment. ECF Nos. 15 at 15–

11   19; 50 at 31–39.

12        I previously ruled Ground 3(A) is procedurally defaulted but deferred ruling until after

13   the parties' briefed the merits because Stewart contends that he can overcome the default under

14   *Martinez*. ECF No. 40 at 9.  The respondents contend Stewart cannot overcome his procedural

15   default for Ground 3(A), the Supreme Court of Nevada's rejection of the claims in Grounds 3(C)

16   and 3(D) is objectively reasonable, and Stewart cannot establish prejudice because there is no

17   reasonable probability the jury would have convicted Stewart of the lesser-included offenses

18   instead of first-degree kidnapping. ECF Nos. 47 at 16–20;  55 at 8–12.  The parties do not

19   dispute that false imprisonment and second-degree kidnapping are lesser-included offenses of

20   first-degree kidnapping.  For the reasons discussed below, I dismiss Ground 3(A) with prejudice

21   as procedurally defaulted. *Martinez*, 566 U.S. at 14–16. I deny habeas relief for Grounds 3(C)

22   and 3(D) because the Supreme Court of Nevada's determinations are neither contrary to, nor

23   constitute an unreasonable application of, clearly established Supreme Court authority, or

alternatively on de novo review, because the claims lack merit. 28 U.S.C. § 2254(d); *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

### 1.      Applicable Legal Principles

An instruction on a lesser-included offense is mandatory, without requiring a request of the defendant, if there is "evidence which would absolve the defendant from guilt of the greater offense or degree but would support a finding of guilt of the lessor offense or degree." *Lisby v. State*, 414 P.2d 592, 595 (Nev. 1966); *see also e.g., Larsen v. State*, 566 P.2d 413, 414 (Nev. 1977) (holding trial court not required to *sua sponte* instruct on false imprisonment as a lesser-included offense of kidnapping as the evidence showed guilt beyond the lesser offense).  Upon request, a defendant is entitled to a jury instruction on his theory of the case, provided some evidence, "no matter how weak or incredible," supports it. *Rosas v. State*, 147 P.3d 1101, 1104 (Nev. 2006), *abrogated on other grounds by Alotaibi v. State*, 404 P.3d 761 (Nev. 2017). "Conversely, 'if the prosecution has met its burden of proof on the greater offense and there is no evidence at the trial tending to reduce the greater offense, an instruction on a lesser included offense may properly be refused.'" *Id.*, 147 P.3d at 1106; *see, e.g., Lisby,* 414 P.2d at 595 (stating an instruction for a lesser offense is unnecessary "[w]here the evidence would not support a finding of guilty of the lesser offense or degree, e.g., where the defendant denies any complicity in the crime charged and thus lays no foundation for any intermediate verdict or where the elements of the defenses differ, and some element essential to the lesser offense is either not proved or shown not to exist."); *State v. Moore*, 233 P. 523, 526 (Nev. 1925) ("It is a well-understood rule that, if there is no evidence given tending to establish an alleged fact, no instructions need be given on the matter.")  "[A] court must focus on whether credible evidence

admitted at trial warranted a lesser included offense, not whether the evidence was sufficient to prove the greater one." *Rosas,* 147 P.3d at 1106 n.10.

"[I]n ineffective-assistance cases involving a failure to request a lesser-included-offense instruction, *Strickland* requires a reviewing court to assess the likelihood that the defendant's jury would have convicted only on the lesser included offense." *Crace v. Herzog,* 798 F.3d 840, 849 (9th Cir. 2015). This assessment requires a court to "weigh all the evidence of record . . . to determine whether there was a reasonable probability that the jury would have convicted [the defendant] only of [the lesser offense] if it had been given that option." *Id.* (citing *Breakiron v. Horn,* 642 F.3d 126, 140 (3d Cir. 2011)).

### 2.  Ground 3(A)—Instruction on False Imprisonment

"While kidnapping embraces the elements of false imprisonment the converse is not true. False imprisonment differs from kidnapping in that the latter is aggravated by removal of the imprisoned person to some other place." *Jensen v. Sheriff, White Pine Cnty.,* 508 P.2d 4, 5 (Nev. 1973); *compare* Nev. Rev. Stat. § 200.310(1) (A person commits first-degree kidnapping where a person "willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever with the intent to hold or detain, or who holds or detains, the person . . . for the purpose of committing . . . robbery upon or from the person . . . .") *with* Nev. Rev. Stat. § 200.460(1) ("False imprisonment is an unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority.").

Stewart's claim that he was prejudiced by trial counsel's failure to request the false imprisonment instruction lacks merit. Had counsel requested an instruction for false imprisonment, the request would have been properly refused because there is no trial evidence tending to reduce the greater offense. *Rosas,* 122 Nev. at 1265, 147 P.3d at 1106. Lumba

testified Stewart did not merely confine or detain her; rather, he moved her from the exterior-front-porch of her apartment to inside her apartment, and once inside he moved her to her back bedroom, all under circumstances that indicate he did so with the intention to rob her.  Although the jury heard that Stewart told the police he went to Lumba's apartment and looked for things to steal while she was allegedly in another room conducting consensual activities with his coconspirator, that story, even if believed, fails to establish slight or incredible evidence upon which a rational jury could conclude Stewart falsely imprisoned Lumba. *Lisby*, 82 Nev. at 187, 414 P.2d at 595.  The record fails to support a conclusion that, had counsel requested an instruction on false imprisonment, the instruction would have been given, or a reasonable probability that, based on the trial evidence, a jury would have convicted Stewart of false imprisonment had it been given the opportunity to consider that lesser-included offense. Stewart's claim is insubstantial and fails to overcome the procedural default under *Martinez*.

### 3. Grounds 3(C) and 3(D)—Instruction on Second-Degree Kidnapping

The Supreme Court of Nevada rejected the claims that trial and appellate counsel were ineffective for failing to argue the necessity of a jury instruction for second-degree kidnapping, because the jury found Stewart guilty of the greater offense of first-degree kidnapping beyond a reasonable doubt, and because the Supreme Court of Nevada previously concluded that sufficient evidence supports Stewart's conviction for first-degree kidnapping. ECF No. 29-15 at 3.

### b. Ground 3(C)—Ineffective Assistance of Trial Counsel

Stewart claims I need not defer to the Supreme Court of Nevada's determination that trial counsel was not ineffective in failing to request an instruction for second-degree kidnapping because the Supreme Court of Nevada did not "assess the likelihood the defendant's jury would have convicted on the lesser included offense." ECF No. 50 at 38 (relying on *Crace*, 798 F.3d at

21

849).  In *Crace*, a state court concluded there was no prejudice under *Strickland* due to counsel's

failure to request an instruction on a lesser-included offense because there was "sufficient"

evidence to support the jury's verdict for the greater offense and the state court presumed the

jury found each element of the greater offense proved beyond a reasonable doubt. *Crace*, 798

F.3d at 847.  The Ninth Circuit held the state court's methodology was an unreasonable

application of *Strickland* because it improperly "converted *Strickland's* prejudice inquiry into a

sufficiency-of-the-evidence question." *Id.* at 849.  The court in *Crace* stated, "*Strickland requires*

*a reviewing court to assess the likelihood that the defendant's jury would have convicted only on*

*the lesser included offense.*" *Crace*, 798 F.3d at 849 (emphasis in original).

Regardless whether I review this claim under AEDPA's deferential standard of review or

*de novo*, I find Stewart is entitled to no federal habeas relief. *See Berghuis*, 560 U.S. at 390

("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when

it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled

to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a).").  For

the charge of first-degree kidnapping, the State had to prove beyond a reasonable doubt that

Stewart kidnapped Lumba "for the purpose of committing robbery upon or from the person."

Nev. Rev. Stat. § 200.310(1).  For second-degree kidnapping, the State would have had to prove

Stewart kidnapped Lumba only "with intent to keep" her "secretly imprisoned" or "in any

manner detained against [her] will." Nev. Rev. Stat. § 200.310(2).  The state court's record

shows a request for an instruction for second-degree kidnapping would have been properly

refused because there is no trial evidence tending to reduce the greater offense. *Rosas*, 122 Nev.

at 1265, 147 P.3d at 1106.  Lumba testified she did not know Stewart and his coconspirator, and

the men forced her and themselves into her apartment.  The men sent her to her back bedroom

1   and immediately took turns ransacking her apartment and watching over her, while they, among

2   other things, peppered her with inquiries where she kept cash, escorted her to open her jewelry

3   box, and requested PINs for her debit cards and iPhone.  No evidence supports a theory that

4   Stewart forced Lumba into her apartment and bedroom merely to keep her secretly imprisoned or

5   detained against her will other than for the purpose of robbing her.  I find no merit in the claim

6   that trial counsel's performance was deficient or prejudicial under *Strickland*.  Based on the

7   evidence, there is no reasonable probability a request for the instruction on second-degree

8   kidnapping would have been granted or that a jury would have convicted Stewart of second-

9   degree kidnapping given the opportunity to consider that lesser offense.

10              **c.      Ground 3(D)—Ineffective Assistance of Appellate Counsel**

11              A trial court in Nevada is obligated to instruct on a lesser-included offense where the

12   evidence would absolve the defendant from guilt of the greater offense but support guilt for the

13   lesser offense. *Lisby*, 414 P.2d at 595.  Here, the trial evidence fails to support a conclusion that

14   Stewart forced Lumba into her apartment and to her back bedroom to keep her secretly

15   imprisoned or detained against her will for a purpose that satisfies only second-degree

16   kidnapping.  Rather, the evidence, if believed, supports only the greater offense.  There is

17   therefore no factual basis to conclude appellate counsel was deficient as there is no basis for

18   appellate counsel to contend the trial court was obligated to *sua sponte* instruct the jury that it

19   could consider second-degree kidnapping as a lesser-included offense and no reasonable

20   probability the result of the appeal would have been different had appellate counsel challenged

21   the failure to *sua sponte* instruct the jury on the lesser offense of second-degree kidnapping.

22   / / / /

23   / / / /

**D.      Ground 4—Procedurally Defaulted IAC Claims**

      **1.      Ground 4(A)—Failure to Move to Suppress Pretrial Identification**

Stewart alleges trial counsel was ineffective in failing to move for suppression of the photographic lineup and failing to object to admission of Lumba's pretrial identification.  He claims Lumba's out-of-court identification was an unreliable product of unnecessary and suggestive police procedures because it was not a double-blind administration (Detective Abell knew Stewart was the targeted suspect in the lineup) and Stewart was the only individual in the lineup who wore a patterned shirt. ECF Nos. 15 at 19–21; 50 at 40–45.  I previously concluded this claim is procedurally defaulted and deferred ruling until the parties briefed the merits as Stewart alleges he can overcome the default under *Martinez*. ECF No. 40 at 11.  The respondents contend Stewart cannot overcome the procedural default because he fails to establish a substantial claim that trial counsel's omission was prejudicial as the police found Stewart's fingerprint in Lumba's apartment. ECF Nos. 47 at 20–21, 55 at 12–13.  For the reasons discussed below, I dismiss Ground 4(A) because Stewart fails to overcome the procedural default.  There is no merit to his claim that trial counsel's omissions were deficient and prejudicial under *Strickland*. *Martinez*, 566 U.S. at 14–16.

      **a.      Applicable Legal Principles**

"An identification infected by improper police influence . . . is not automatically excluded." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).  The Supreme Court explained in *Perry* that the reliability of eyewitness-identification testimony "typically falls within the province of the jury," but that the Court had previously recognized a "due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime."

1   *Id.*  "If there is 'a very substantial likelihood of irreparable misidentification,'" a "judge must

2   disallow presentation of the evidence at trial." *Id.*  However, where there are suggestive

3   circumstances, "[i]f the indicia of reliability are strong enough to outweigh the corrupting effect

4   of the police-arranged suggestive circumstances, the identification evidence ordinarily will be

5   admitted, and the jury will ultimately determine its worth." *Id.*  Where no improper law

6   enforcement activity is involved, reliability is tested by cross-examination, rules of evidence, and

7   jury instructions. *Id.* at 233.

8                         **b.**     **Additional Background**

9        Before showing the photographic-lineup array to Lumba, Lumba acknowledged

10  instructions informing her, among other things, that the lineup "may or may not contain a picture

11  of the person who committed the crime . . . and [t]he fact that the photos [were being shown to]

12  her should not cause [her] to believe or guess that the guilty person has been caught."  The

13  instructions informed Lumba that she did not have to identify anyone, and it is "just as important

14  to free innocent persons from suspicion as it is to identify those who are guilty."  The

15  instructions cautioned her that photographs do not always depict a person's true complexion and

16  hair styles are easily changed.  After viewing the array, Lumba provided a statement indicating

17  that Stewart "has a similar face shape, eyes, nose, complexion & face shape as the taller

18  assailant" and that he "looks a lot like the taller robber." *See supra* at pp. 3–4.  ECF No. 57.

19        At trial, Lumba testified she thought the photographs that she identified looked like the

20  two men who committed the crime; however, she wasn't certain.  When she viewed Stewart at

21  trial, she testified she was not sure he was one of the perpetrators.  The State moved to admit the

22  lineup and instructions, including Lumba's statement concerning her selections in the lineup.

23  The trial court overruled defense counsel's objection that Lumba's statements concerning the

1 lineup were hearsay. ECF No. 24-1 at 43–48, 56–57.  The detective later read to the jury

2 Lumba's written statement concerning her choices. ECF No. 24-2 at 83; *See supra* at p. 3.

3            **c.**        **Analysis of Ground 4(A)**

4         To prevail on a claim of ineffective assistance of counsel predicated on the failure to file

5 a motion to suppress evidence, a petitioner must establish the motion has merit and there is a

6 reasonable probability the jury would have reached a different verdict absent the introduction of

7 the evidence in issue. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).  To succeed with a

8 motion for suppression, or a successful objection to the admission, of evidence concerning

9 Lumba's pretrial identification, it was not enough to show Lumba's pretrial identification was

10 unreliable.  The reliability of an identification is a question for the jury unless the identification

11 resulted from improper police influence or suggestive circumstances such that there is a very

12 substantial likelihood of irreparable misidentification. *Perry*, 565 U.S. at 232.  There is no merit

13 to such a finding here.  Lumba's statement in response to viewing the lineup, her signature on the

14 lineup instructions, and her testimony contradict a conclusion that her identification was the

15 product of a police-arranged corrupting influence or suggestive circumstance that led her to

16 choose Stewart's photograph in the pretrial lineup.  One could speculate that a double-blind

17 administration of the lineup procedure and a different photograph of Stewart were preferable, but

18 the record fails to show that the identification procedure Abell used constitutes improper police

19 influence or suggestive circumstances that created a very substantial likelihood of irreparable

20 misidentification, such that the pretrial identification would have been excluded under the Due

21 Process Clause.  Although defense counsel elicited the fingerprint examiner's testimony that her

22 report indicates she printed Stewart's exemplar a couple of months after she claimed that she

23 performed her analysis, those circumstances, without more, fail to establish a basis to conclude

the police-arranged pretrial-identification procedure was the product of a corrupting influence or suggestive circumstance. Thus, Stewart fails to establish there is a factual basis for, or any merit to, his claim that trial counsel's failure to move to exclude the pretrial identification or object to the introduction of the lineup fell outside the wide range of reasonable professional assistance and that there is a reasonable probability counsel would have succeeded with such a motion.

Stewart contends his counsel's failure to move to exclude Lumba's identification was prejudicial because without it, counsel could have persuasively argued the forensic evidence was flawed, inconclusive, or there was another reason why the print was discovered in Lumba's apartment. ECF No. 50 at 43–44. The respondents object that these arguments represent an untimely IAC claim based on counsel's failure to pursue a more robust defense to the fingerprint analysis. ECF No. 55 at 13. Even assuming, arguendo, that I was to consider Stewart's new arguments, they are speculative and lack factual support, and thus fail to substantiate the IAC claim. *Martinez*, 566 U.S. at 14–16; *Harrington*, 562 U.S. at 112; *Cullen*, 563 U.S. at 189.

### 2.    Ground 4(B)—Failure to Move to Suppress Statements

Stewart alleges trial counsel was ineffective in failing to timely move to suppress Stewart's statements to the police. Stewart claims the motion would have been granted based on authorities that existed at that time. He further claims counsel was ineffective in failing to move to suppress Stewart's statements on the grounds that Stewart was under the influence of alcohol and ecstasy during the interrogation. ECF Nos. 15 at 22–25; 50 at 45–50. The respondents contend this claim is without merit as the Supreme Court of Nevada rejected the *Miranda* claim on direct appeal, and Stewart presents no evidence he was intoxicated or that his intoxication rendered his statement involuntary. ECF Nos. 47 at 21–22; 55 at 13–14. I previously deferred ruling whether Stewart can overcome the procedural default of this claim until my review of the

merits. ECF No. 40 at 11.  For the reasons discussed below, I dismiss Ground 4(B) with prejudice because Stewart fails to overcome the procedural default of this claim.  He has failed to show that there is a reasonable probability that a timely motion to suppress would have been granted. *Martinez*, 566 U.S. at 14–16.

### a.    *Miranda* **Warning**

Stewart was given *Miranda* warnings and then provided his statement to the police on February 14, 2015. ECF No. 24-2 at 91.  Thereafter, a split of authority emerged among the federal district courts in Nevada over whether the same *Miranda* warning given to Stewart, based on Metro's warning card, was adequate. *See United States v. Chavez* 111 F. Supp. 3d 1131, 1146 (2015), *reversed in part on other grounds by U.S. v. Chavez*, 673 Fed. Appx. 754 (2016); *United States v. Loucious*, Case No. 2:15-cr-00106-JAD-CWH, Feb. 19, 2016 (Dorsey, J.), *reversed by United States v. Loucious*, 847 F.3d 1146 (9th Cir. 2017); *United States v. Waters*, No. 2:15-CR-80 JCM (VCF), 2016 WL 310738 (D. Nev. Jan. 26, 2016);  *United States v. Davis*, No. 2:12-CR-289 JCM (PAL), 2016 WL 3092110 (D. Nev. June 1, 2016).

Defense counsel moved to suppress Stewart's statement to the police, arguing the *Miranda* warnings were insufficient. ECF No. 23-11 at 2, 4–6.  The State opposed, contending the motion was untimely and the warnings were adequate. ECF No. 23-12.  Before trial, a state district court judge denied the motion as untimely and on the merits. ECF No. 23-13 at 3–4.  At trial, defense counsel attempted to argue the merits of the motion, explaining that federal district court judges in Nevada had ruled "[t]he *Miranda* cards used by Metro are improperly [sic] state the law," but acknowledging nothing had been published by the Ninth Circuit Court of Appeals. The trial court stated that the prior rulings that the motion was untimely and lacked merit were "the law of the case."  ECF No. 24-1 at 4–8.

1    Stewart's claim that he was prejudiced by counsel's failure to timely move to exclude his

2  statements based on the *Miranda* warnings is without merit. *Kimmelman*, 477 U.S. at 375.  The

3  state district court ruled the motion was untimely, but nonetheless denied the motion on the

4  merits, finding the *Miranda* warnings adequate.  Given the state court's ruling, it is speculative to

5  conclude there is a reasonable probability the motion would have been granted had it been timely

6  filed. *See, e.g., Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)  (noting, "[a] decision of a

7  federal district court judge is not binding precedent in either a different judicial district, the same

8  judicial district, or even upon the same judge in a different case.").  Moreover, the Ninth Circuit

9  Court of Appeals subsequently resolved the split by deciding Metro's warning is adequate. *See

10  Loucious*, 847 F.3d 1146.  Stewart has not shown that trial counsel's failure to timely move to

11  suppress Stewart's statements was prejudicial for purposes of overcoming the procedural default

12  of this claim.

13                              **b.    Intoxication**

14    Stewart claims trial counsel should have moved to exclude Stewart's statement to the

15  police as involuntary due to Stewart's intoxication.  The Supreme Court of Nevada has ruled that

16  intoxication may cause a statement to be inadmissible. *See, e.g., Kirksey v. State,* 923 P.2d 1102,

17  1109–10 (Nev. 1996) (discussing intoxication as it relates to whether a statement is voluntary);

18  *Falcon v. State*, 874 P.2d 772, 774–75 (Nev. 1994) (discussing intoxication as it relates to

19  whether a *Miranda* waiver is voluntary and intelligent).  However, "[i]ntoxication alone does not

20  automatically make a confession inadmissible," rather; "[a] confession is inadmissible only if it

21  is shown "that the accused was intoxicated to such an extent that he was unable to understand the

22  meaning of his comments." *Kirksey*, 923 P.2d at 1110 (internal quotations omitted).

23

1   This claim is wholly without factual support in the record.  Stewart attempts to

2   substantiate this claim by pointing out that in one of his jail calls, he stated he did not recall what

3   he told police because he was drunk; that he alleged in his state postconviction proceeding that

4   he told trial counsel he was "high on alcohol, ecstasy and marijuana at the time of the interview"

5   with Detective Abell; and that trial counsel should have included those facts in the motion to

6   suppress his statements to police. ECF Nos. 15 at 25; 50 at 48–49.  Apart from those self-serving

7   statements, Stewart provides no facts showing he was intoxicated at the time of his interview to

8   such an extent that he was unable to understand the meaning of his comments to police.

9   **3.      Ground 4(C)—Failure to Object to Admission of Jail Calls**

10   Stewart alleges trial counsel provided ineffective assistance by failing to object to the

11   admission of jail calls.  Stewart claims counsel should have objected that the calls contain no

12   relevant information or admissions of guilt, revealed to the jury that Stewart was incarcerated,

13   and counsel should have objected to the detective's interpretations of the substance of the calls as

14   incriminating because it was more prejudicial than probative. ECF Nos. 15 at 25–26; 50 at 50–

15   52.  The respondents contend this claim is procedurally defaulted and meritless because

16   Stewart's incarceration was established through other testimony and Stewart discussed the

17   crimes during the calls. ECF Nos. 47 at 22–23; 55 at 15–16.  I deferred ruling on whether

18   Stewart can overcome the procedural default of this claim until the merits stage. ECF No. 40 at

19   11.  I now dismiss Ground 4(C) because Stewart fails to overcome the procedural default of this

20   claim.  There is no merit to his claim that trial counsel's performance fell outside the wide range

21   of professionally competent assistance under *Strickland*. *Martinez*, 566 U.S. at 14–16.

22   The jury heard testimony from the arresting officers and detective Abell that Stewart was

23   arrested and booked into custody where his calls were recorded. *See supra* at p. 4; ECF No. 24-2

at 98–99.  The parties stipulated to the admission of "the relevant parts" of jail calls Stewart

made a day or two after his arrest and calls were played for the jury. *Id.* at 100–01.  Detective

Abell offered his opinion that the purpose and relevance of one call—where Stewart asked to tell

someone to call another person and say that "stuff" happened in his area and apartments—was to

alert his co-conspirator and to let him know the charges against him. *Id.* at 100–02.  Abell also

offered his opinion that in another call, Stewart's statements about fingerprints and identification

erroneously stated the police did not have his fingerprints or an identification by Lumba. *Id.* at

103–04.

In closing argument, defense counsel characterized the jail calls as sounding "like Charlie

Brown's teacher," and encouraged the jury to play the jail calls, arguing "there is nothing

damning on those" and "[n]ever at any point in time does Tommy Stewart say, I was there, I

robbed Natasha Lumba, I did all the things the State is here accusing me of today." ECF No. 24-

3 at 19.  The State likewise urged the jury to listen to the jail calls and argued that, considering

the police did not have a fingerprint or lead for the other suspect, Stewart demonstrated

consciousness of guilt when, during one of the calls, he asked someone to call another person

because something happened in his neighborhood. *Id.* at 35.  The State also argued that Stewart

demonstrated consciousness of guilt in a second call by discussing whether he was identified and

whether he left a fingerprint. *Id.*

Stewart fails to show that trial counsel's failure to object to the admission of the jail calls

or the detective's opinion falls "outside the wide range of professionally competent assistance."

*Strickland*, 466 U.S. at 690.  First, the jury heard Stewart was arrested and taken into custody

through testimony apart from the jail calls.  Second, an objectively reasonable trial attorney

could conclude it was futile to object to either the admission of the calls or the detective's

interpretation of them because, however difficult the statements in them are to discern, they could be considered relevant and probative of consciousness of guilt.  Third, the recordings are of such poor-quality that an objectively reasonable attorney could choose, as counsel did here, to stipulate to the admission of the relevant portions of the calls, refrain from objecting to the detective's speculation about Stewart's statements in the recording, and argue to the jury that Stewart made no incriminating statements in the jail calls.  Finally, an objectively reasonable attorney could conclude objection was futile because the probative value of that evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury given the poor-quality of the recordings. Nev. Rev. Stat. § 48.035.  Stewart thus fails to establish a substantial claim as required to overcome the procedural default that trial counsel's performance was deficient under *Strickland.*

### 4.    Ground 4(D)—Failure to Object to Testimony about Co-Perpetrator

Stewart alleges trial counsel provided ineffective assistance by failing to object to Lumba's testimony that the second perpetrator placed his hands under her brassiere and underpants to search for money while Stewart searched her apartment.  Stewart claims the testimony was irrelevant because the charge of lewdness was dismissed at the preliminary hearing, and the testimony was highly prejudicial to Stewart because it was inflammatory and may have lured the jury to convict on an improper basis. ECF No. 15 at 26–27; 50 at 53–55.  The respondents contend this claim has no merit. ECF Nos. 47 at 23–24; 55 at 16–18.  I deferred ruling whether Stewart can overcome the procedural default of this claim until the merits stage. ECF No. 40 at 11.  I find Stewart fails to establish the claim has merit and fails to overcome the procedural default of this claim, so I dismiss Ground 4(D) as procedurally defaulted. *Martinez,* 566 U.S. at 14–16.

An objectively reasonable trial attorney could conclude that a motion to preclude this evidence was futile. *Strickland*, 466 U.S. at 689.  An objectively reasonable attorney could conclude it was futile to object that the testimony was inflammatory and might lure the jury to convict on an improper basis.  Lumba testified the man used his hands only to search for money and did not suggest the man sexually assaulted her. ECF No. 24-1 at 24.  And the trial court instructed the jury that a verdict may never be influenced by sympathy or prejudice, and it is presumed that juries follow instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).  An objectively reasonable attorney could conclude the evidence was relevant to each of the charges by providing circumstantial evidence that was probative of Stewart's intention, i.e., not to sexually assault Lumba, but to rob her of money. *See* Nev. Rev. Stat. § 48.015 ("relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"); ECF No. 24-5 at 12–19, 22, 24–25, 32, 37, 39.  Moreover, an objectively reasonable attorney could conclude the State would successfully argue the evidence was probative of the kidnapping charge by providing a basis for the conclusion that the movement of Lumba from outside her house to her back bedroom inside her apartment exposed her to additional risk.

Thus, Stewart fails to establish the probative value of the testimony was substantially outweighed by a danger of unfair prejudice, confusion of the issues or misleading the jury. *Id.* at 43.  Stewart's claim that objection was appropriate because other evidence demonstrated the intention to rob Lumba falls short of establishing a meritorious IAC claim.  The brief testimony about the co-perpetrator's frisk for money did not needlessly present cumulative evidence and was intertwined with Lumba's testimony about the complete story of the crime. Nev. Rev. Stat.

1  § 48.035(2) ("Although relevant, evidence may be excluded if its probative value is substantially

2  outweighed by considerations of undue delay, waste of time or needless presentation of

3  cumulative evidence."); Nev. Rev. Stat. § 48.035(3) ("Evidence of another act or crime which is

4  so closely related to an act in controversy or a crime charged that an ordinary witness cannot

5  describe the act in controversy or the crime charged without referring to the other act or crime

6  shall not be excluded, but at the request of an interested party, a cautionary instruction shall be

7  given explaining the reason for its admission.").

8         **5.      Ground 4(E)—Cumulative Error of Trial Counsel**

9         Stewart alleges he was prejudiced by the cumulative errors of trial counsel, i.e., had

10  counsel successfully suppressed Stewart's statement to police, suppressed the photographic

11  lineup, successfully objected to the jail calls, and successfully objected to Lumba's testimony

12  concerning the second perpetrator's actions in her bedroom, the outcome of Stewart's trial would

13  have been different. ECF Nos. 15 at 27; 50 at 55–56.  The respondents contend this claim is

14  procedurally defaulted and Stewart cannot overcome the default because *Martinez* does not apply

15  to claims of cumulative error, there is no clearly established Supreme Court authority

16  recognizing cumulative error for *Strickland* claims, only non-defaulted trial error may be

17  considered for cumulative error, and Stewart cannot overcome his procedural default because

18  there is no trial-counsel error to accumulate. ECF Nos. 47 at 24–25; 55 at 18–19.  I deferred

19  ruling on whether Stewart can overcome the default until the merits stage. ECF No. 40 at 11.

20         Before turning to the issue whether Ground 4(E) is procedurally defaulted, I note that

21  although IAC claims are examined separately to determine whether counsel was deficient,

22  "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown*, 404

23  F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir.

34

1978)).  In *Browning v. Baker*, the Ninth Circuit held, "[w]hile an individual claiming IAC 'must

identify the acts or omissions of counsel that are alleged not to have been the result of reasonable

professional judgment,'" the court "considers counsel's conduct as a whole to determine whether

it was constitutionally adequate." 875 F.3d 444, 471 (9th Cir. 2017).  On consideration of the

merits of Stewart's IAC claims as a whole, and assuming he could overcome the procedural

defaults of some of his claims of ineffective assistance of counsel, I conclude that Stewart does

not show that, on the whole, trial counsel's actions or omissions were deficient and prejudicial or

that he received constitutionally inadequate assistance from counsel in denial of due process or a

fair trial.

I now turn to Ground 4(E), i.e., Stewart's procedurally defaulted claim of cumulative

error based on certain alleged errors of trial counsel, i.e., that he was prejudiced by trial counsel's

failure to seek suppression of Stewart's statement to police, suppression of the photographic

lineup, object to the jail calls and to Lumba's testimony concerning the second perpetrator's

actions in her bedroom. "The Supreme Court has clearly established that the combined effect of

multiple trial court errors violates due process where it renders the resulting criminal trial

fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v.

Mississippi*, 410 U.S. 284, 298, 302–03 (1973)).  Habeas relief has been granted based on the

"cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors,

such that they amplify each other in relation to a key contested issue in the case." *Ybarra v.

McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle*, 505 F.3d at 933).  The cumulative

impact of the errors must render the trial and sentencing "fundamentally unfair." *Id.* (quoting

*Parle*, 505 F.3d at 927).  When "no error of constitutional magnitude occurred, no cumulative

prejudice is possible." *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  A court "cannot

1  consider the cumulative effect of *non*-errors." *McGill v. Shinn*, 16 F.4th 666, 684–85 (9th Cir.

2  2021) (quoting *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018)).

3      Stewart fails to establish a substantial claim of cumulative trial error or that the actions of

4  his trial counsel denied him a fundamentally fair trial.  There are no errors of trial counsel to

5  accumulate.  The only instance of deficient performance was counsel's failure to timely file a

6  motion to suppress evidence; however, the state district court ruled on the merits of the motion.

7  Stewart has not shown that trial counsel's failure to timely file a motion to suppress evidence has

8  a unique symmetry with otherwise harmless errors that amplify each other in relation to a key

9  contested issue in the case.  I therefore dismiss Ground 4(E) with prejudice as procedurally

10  defaulted or alternatively without merit.

11  **IV.    Certificate of Appealability**

12      This is a final decision adverse to Stewart.  Rule 11 of the Rules Governing Section

13  2254 Cases requires that I issue or deny a certificate of appealability (COA).  I have s*ua*

14  *sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28

15  U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).  A COA may issue

16  only when the petitioner "has made a substantial showing of the denial of a constitutional right."

17  28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must

18  demonstrate that reasonable jurists would find the district court's assessment of the constitutional

19  claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v.*

20  *Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue if reasonable

21  jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional

22  right and (2) whether my procedural ruling was correct. *Id.*  Applying these standards, a

23  certificate of appealability is not warranted.

**V.      Conclusions**

I THEREFORE ORDER that the petition **(ECF No. 15) is denied** with prejudice.

I FURTHER ORDER that any requests for an evidentiary hearing are **denied**.

I FURTHER ORDER that a Certificate of Appealability is **denied**.

I FURTHER ORDER the clerk of the court to substitute Ronald Oliver for the respondent Calvin Johnson.

I FURTHER ORDER the clerk of the court to enter a final judgment in favor of the respondents and against Stewart dismissing this action with prejudice and to close this case.

DATED this 12th day of March, 2024.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE